IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL BLUEMLING, JR.,           )
                    Plaintiff,    )
                                  )
        vs.                       )        Civil Action No. 08-1421
                                  )
PNC BANK,                         )        Judge David S. Cercone
                    Defendant,    )        Magistrate Judge Lisa Pupo Lenihan
                                  )

REPORT AND RECOMMENDATION

I.      Recommendation

        It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendant PNC Bank (ECF No. 44) be granted with respect to Plaintiff's harassment

claims, failure to promote claims and retaliation claims and denied in all other respects.

II.     Report

        Plaintiff, Michael Bluemling, Jr., brings this action against his former employer,

Defendant PNC Bank, pursuant to the Americans With Disabilities Act, 42 U.S.C.

§§ 12101-12117 (ADA) and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA).

He alleges that Defendant discriminated against him on the basis of his disability (post-

concussion syndrome (PCS) that causes him headaches in stressful situations and affects his

memory), that it failed to accommodate him, that it harassed him, that it failed to promote him

and that it retaliated against him for complaining about discrimination, culminating in his

constructive discharge on November 30, 2007.

        Presently before this Court for disposition is a motion for summary judgment filed by

Defendant.  For the reasons that follow, the motion should be granted with respect to Plaintiff's

harassment claims, failure to promote claims and retaliation claims and denied in all other

respects.

Facts[1]

From September 11, 2006 to November 30, 2007, PNC employed Plaintiff as a Financial Sales Consultant ("FSC") with its Inbound Sales Team at its National Financial Services Center ("NFSC") located in Pittsburgh, Pennsylvania. (Bluemling Dep. at 30-31, 43-44,141-42.)[2] The NFSC is the contact center for PNC's Consumer Bank and is responsible for sales and service delivery of PNC Bank consumer products and services. (Munz Decl. ¶ 2; Yocca Decl. ¶ 3.)[3] All calls to the NFSC are screened through an interactive voice response ("IVR") system using a series of recorded questions. (Yocca Decl. ¶ 4.) Depending on the customer's response, the call is directed to a group of Sales or Service FSCs who have the appropriate set of skills to address the customer's needs. (Yocca Decl. ¶ 5.) Randy Yocca, manager of PNC's Service Level Team (Yocca Decl. ¶ 1), explains that:

> The Service Level Team assigns each FSC with a set of skills. The set of skills are developed by the line of business, in conjunction with PNC's senior management, and the Service Level Team. For example, an agent can be assigned customer service skills which would automatically direct a customer with service questions to that particular FSC.

---

[1]Some of these facts are taken from the Concise Statement of Material Facts filed by Defendant (ECF No. 45), and from Plaintiff's Concise Statement of Material Facts (ECF No. 51), to which Defendant has responded (ECF No. 53), but only where such facts are actually supported by the record references cited by the parties. Plaintiff has not submitted a response to Defendant's Concise Statement with numbered paragraphs and citations to the record, as required by Local Rule 56(C)(1). Defendant argues that, pursuant to the Local Rules, its facts should be deemed admitted. LCvR 56(E). The Court should not deem Defendant's facts admitted, particularly because not all of them are supported by the record.

[2]ECF No. 45 Ex. A.

[3]ECF No. 45 Exs. B, C.

Sales FSCs are assigned sales skills and back-up service skills.

If there are no sales calls coming in but there are calls waiting to be answered in service and if more than one Sales FSC has been sitting idle, the IVR will automatically route a service call to that FSC.

Managers cannot route customer calls to or away from a particular FSC. Any modifications to the set of skill[s] must be made by the Service Level Team.

(Yocca Decl. ¶¶ 6-9.)

Plaintiff testified that, during his initial employment interview with Brook Harwood (who would later become his supervisor), he told Harwood that he was a disabled veteran. (Bluemling Dep. at 31-32.) Harwood denied that Plaintiff told him he was a disabled veteran. (Harwood Dep. at 8.)[4]

The Training Program

For the first three and one half weeks of his employment with PNC, Plaintiff was required to attend a rigorous training program for all new hires in Inbound Sales. (Bluemling Dep. at 96-97.) The training provided FSCs with extensive information on PNC's products and services as well as PNC compliance policies. (Munz Decl. ¶ 6.) In addition, FSCs were advised that PNC would routinely monitor their calls to ensure compliance with federal and state law and PNC policies. (Munz Decl. ¶ 9.) Plaintiff agreed to PNC monitoring. (Bluemling Dep. at 49.)

Sales FSCs were trained to convert service calls to sales calls by eliciting the inquiring customers' needs and offering products and services to meet those needs and thereby generate revenue credits that lead to incentive compensation for the FSC. (Munz Decl. ¶ 6; Bluemling Dep. at 40-41.) Plaintiff acknowledged that most of the training program focused on service

---

[4] Pl.'s Br. Opp'n (ECF No. 50), Pl.'s Exs. at 93.

calls, but stated that he did not understand why because he had been hired to do sales. (Bluemling Dep. at 31, 96-97.)

Plaintiff Excels at Sales Performance

Plaintiff successfully completed the training program, receiving compliments from the training manager on his performance. (Bluemling Dep. at 100-01.) In early October 2006, Plaintiff was assigned to Team 4 of Inbound Sales, reporting to Andrew Munz, a Lead Financial Sales Consultant. (Bluemling Dep. at 44; Munz Decl. ¶ 7.) He soon became a strong sales producer for PNC, with overall positive performance evaluations. (Bluemling Dep. at 105-06 (referring to himself as the best salesman); id. at 109-10, 112; 114-16; id. at 212 (claiming that he "did the job wonderfully"); Bluemling Dep. Exs. 9, 10;[5] Munz Decl. ¶¶ 13, 22 & Exs. C, G.) Plaintiff testified that he knew how to perform his job better than anyone else and that he was consistently the highest performer. (Bluemling Dep. at 105-06, 109-10, 112, 114-16, 212.) Defendant has not disputed this assertion.

For the month of February 2007, Plaintiff claimed he took far more applications per hour than any other FSC: he took 129 applications in 119 hours, or 1.08 applications per hour, while the next closest FSC took only 100 applications in 146 hours, or .68 applications per hour. (Bluemling Dep. Ex. 9.) Further, in June 2007, Plaintiff facilitated the application for and the closing of a $1 million Home Equity Line of Credit; it was only the 10th $1 million or larger line of credit for his group for the year, "so it [was] a big deal." (Bluemling Dep. Ex. 9.) Likewise, in early July 2007, he ranked first among inbound sales consultants for "Sold Loan Results," for which he received a cash award. (Bluemling Dep. Ex. 9.)

---

[5]ECF No. 45 Ex. D.

Plaintiff received a salary increase in July 2007 followed by a 3% merit raise on August 25, 2007. (Munz Decl. ¶ 7.) In addition to his regularly scheduled shift, Plaintiff began volunteering for overtime hours as early as October 2006. (Harwood Dep. at 28.)[6] He continued to work overtime throughout his employment, often signing up for multiple hours per week. (Munz Dep. at 23.)[7]

Corrective Actions

On January 3, 2007, Plaintiff received his first corrective action, a verbal warning for taking extended breaks and an extended lunch. (Munz Decl. ¶ 10 & Ex. A.) Munz states that Plaintiff never told him that he took these extended breaks or the extended lunch because of a medical condition or a disability. (Munz Decl. ¶ 11.)

On January 5, 2007, Munz gave Plaintiff a written warning for ordering a new bank card for a customer within three days of an address change on the customer's account in violation of PNC policy. (Bluemling Dep. at 118-19; Bluemling Dep. Ex. 11B.) Munz states that this policy violation presented a risk of substantial financial loss for PNC. (Munz Decl. ¶ 12 & Ex. B.) Plaintiff denied that this incident occurred. (Bluemling Dep. at 118-19.)

The First Call Dumping Incident

On or around February 20, 2007, NFSC's compliance department reported to Munz that it suspected that Plaintiff was "call dumping," a practice by which an FSC quickly transfers and/or hangs up on a call that he is qualified and trained to handle when it is not likely that the call will generate revenue credits for the FSC. (Munz Decl. ¶ 14.) Munz states that, while Sales FSCs

---

[6]ECF No. 50, Pl.'s Exs. at 100.

[7]ECF No. 50, Pl.'s Exs. at 107.

are given priority in handling sales calls, they are also responsible for service calls on an overflow basis. He further states that answering service calls on an overflow basis is an essential function of the FSC position. (Munz Decl. ¶ 8.) At his deposition, Plaintiff testified that he had never before seen the job description PNC's counsel showed him, titled "Financial Sales/Service Consultant," and that he did not understand why he was receiving service calls when that was not the job he was hired to do. He stated that he never received a job description, that he was told he had been hired to do sales and that he never would have taken the position if he had known about the service calls. (Bluemling Dep. at 46-51, 85-86, 193, 212.)

On or about February 22, 2007, Munz monitored Plaintiff's calls and determined that he was, indeed, call dumping. (Munz Decl. ¶ 14; Bluemling Dep. at 85, 120.) When Munz confronted Plaintiff on February 26, 2007, he admitted that he had transferred the service calls, but said he did so because they were too stressful and they exacerbated the headaches he suffered as a result of his disability. (Munz Decl. ¶ 14; Law Decl. ¶ 12 & Ex. F.[8]) Plaintiff states that he was not the only employee who transferred service calls away. (Bluemling Dep. at 85, 120.)

According to a PNC document authored by Munz dated March 1, 2007, Plaintiff told him the following:

1. He is a military veteran with 10% disability, get[s] head aches from the disability and can't take the volume of service calls offered to him.
2. In his interview, it was never mentioned to him that he would have to take service calls, just that we are a sales department. (Back to disability).
3. Enjoys his job and is a top producer on the floor, but service calls can become too much and can't handle them.
4. He understands the problem.
5. Stated he did not know he could complete some of the request. This was after we first listened to ½ of the calls file at my desk. This portion of the

---

[8]ECF No. 45 Ex. E.

> conversation came about at his desk when I went to discuss the other call
> types that he had transferred.  The reason why we only listened to ½ of
> the call file, once we had discovered the first call that was erroneously
> transferred, Michael wanted to stop.

> According to Rich Brizzi, Michael needs to show documentation supporting the
> disability.  I informed Michael that this warrants a final written warning.

(ECF No. 50, Pl.'s Exs. at 14.)

Munz states that this was the first time since the commencement of Plaintiff's

employment in September 2006 that Plaintiff told him that he was a disabled veteran with a 10%

disability and that his disability prevented him from taking too many service calls because they

exacerbated his headaches.  (Munz Decl. ¶ 14; Law Decl. Ex. F.)

Munz contacted Employee Relations ("ER") on February 27, 2007 to inquire about the

proper response to Plaintiff's alleged impairment and his alleged inability to handle service calls.

(Munz Decl. ¶ 15; Law Decl. Ex. F.)  On March 2, 2007, ER employee Rich Brizzi noted that

Munz "feels that this issue can be resolved with a coaching session.  Medical documentation was

presented. [Munz] wants to do Verbal and try to work around this."  (ECF No. 50 at 13.)

On March 2, 2007, Munz made the following note to the file:

> Michael Bluemling did show documentation supporting his disability.  Rich
> Brizzi stated that it was sufficient that Michael did show me the documentation
> and keeping a copy on file or sending it to him was unnecessary.  According to
> Rich Brizzi, since he did show documentation for this disability we could proceed
> to a final written warning, but we could also consider it a counseling session.  I
> chose to make it a counseling session since a disability did exist.

> I had a counseling session with Michael, in which I explained that taking sales
> calls and service calls are an essential part of the job.  Michael then informed me
> that he is able to complete the essential job functions.  Rich Brizzi and I agreed
> that a reasonable accommodation that we could make for Michael would allow
> him to use after call work (ACW code) for a [sic] 3 extra minutes 1-2 times a day
> more tha[n] usual, or alter his break schedule if needed to help him with
> headaches.  In the counseling session I informed Michael that we could make

those accommodations available to him. Since Michael informed me that he could do the essential functions of the job and can make those reasonable accommodations, if this violation were to occur in the future, it will lead to a final written warning.

(ECF No. 50, Pl.'s Exs. at 17.) <u>See</u> Munz Decl. ¶ 15. On March 2, 2007, Munz gave Plaintiff a verbal warning. PNC states that such violations usually result in the issuance of a final written warning. (Harwood Dep. at 50;[9] Munz Decl. ¶¶ 16-17.)

Munz states that, during the counseling session, he advised Plaintiff that accepting service calls was an essential function of the FSC position, advised him that he was expected to continue to handle both service and sales calls, and warned him that any further call dumping would result in a final written warning. (Munz Decl. ¶ 17.) Plaintiff has not disputed PNC's assertion that he agreed to these conditions.

PNC notes that, in the following months, it also accommodated other medical conditions alleged by Plaintiff by allowing him to wear tennis shoes when he complained of foot pain and by providing him with an ergonomically correct chair to assist with headaches and neck pain. (Bluemling Dep. at 188-89, 191, 193, 210-11; Munz Decl. ¶ 18.)

Munz states in his declaration that, at no time after this late February/early March 2007 time frame did Plaintiff ever ask to be allowed to take only sales calls and no service calls. (Munz Decl. ¶ 17.) However, at his deposition, when asked whether Plaintiff ever indicated that his work performance was being affected by his headaches, Munz replied that Plaintiff "told me he could not take service calls." (Munz Dep. at 23.)[10] Defendant notes that Plaintiff's medical

---

[9]ECF No. 50, Pl.'s Exs. at 90.

[10]ECF No. 50, Pl.'s Exs. at 107.

condition did not affect his ability to continue to be a top sales performer. (Bluemling Dep. at 105-06.)

<u>Other Corrective Actions</u>

On March 7, 2007, Plaintiff received a verbal warning for failing to quote the interest on a loan as "Annual Percentage Rate," in violation of Regulation Z of the Truth in Lending Act. (Bluemling Dep. at 120-21; Munz Decl. ¶ 19 & Ex. D.) Plaintiff admits that he did not follow PNC's standard protocol or "script" when he failed to quote the interest rate as "Annual Percentage Rate." (Bluemling Dep. at 121.) Plaintiff contends that he could not remember every word of the script because of his disability, but he acknowledged that PNC's scripts and protocols were all available electronically and that he could retrieve them at any time if he was having a hard time remembering. (Bluemling Dep. at 121, 182-83.)

On April 10, 2007 and then again on May 18, 2007, Munz gave Plaintiff verbal warnings for his excessive use of occasional absence time within a short time frame. Specifically, Plaintiff had taken 41 hours of absence time between January 10, 2007 and April 5, 2007. (Munz Decl. ¶¶ 20, 24 & Exs. E, H.) In his declaration, Munz states that Plaintiff never advised him that any of his unexcused tardiness or absences were due to a medical condition. (Munz Decl. ¶¶ 20, 24.) However, at his deposition, Munz acknowledged Plaintiff "saying that he had a headache, but he didn't't indicate to what extent." and that "he would tell me from time to time that he had a headache, but he ... never indicated that it was an ongoing medical condition. He just told me he had a headache." (Munz Dep. at 22-23.)[11] Plaintiff stated at his deposition that most of the voluntary time off (VTO) he took was for his disability, and he indicated that management

---

[11]ECF No. 50, Pl.'s Exs. at 107.

should have noted that he was taking a lot of VTO and inquired if there was a problem that could be addressed. (Bluemling Dep. at 271-73.)

On or about April 12, 2007, an NFSC manager reported to Munz that Plaintiff was using profane language in the work place. (Kolvacin Dep. at 8-9, 12-13, 16-17.)[12] Munz reported the complaint regarding profane language to ER. (Law Dep. at 7.)[13] ER Investigator Janice Law conducted an investigation, found the manager's complaint credible and recommended a written warning for the inappropriate workplace conduct in violation of PNC policy. (Law Dep. at 7-11.) Law did not know that Plaintiff had a medical condition or that he purported to be disabled. (Law Dep. at 25-26.) On April 19, 2007, in accord with ER's recommendation, Munz gave Plaintiff a written warning for the use of profanity. (Bluemling Dep. at 126-27; Munz Decl. ¶ 21 & Ex. F.)

On May 7, 2007, Plaintiff was verbally counseled by NFSC supervisors for failing to follow the established protocol in handling sales calls for a third-party client, Capital One. (Bluemling Dep. at 127-28; Munz Dep. at 19-20; Munz Decl. ¶ 23.)

On May 9, 2007, PNC's monitoring team monitored a call that Plaintiff had with an 18 year-old loan applicant in which Plaintiff suggested that the applicant would have a better chance of obtaining a loan with a co-signer. (Bluemling Dep. at 130-32; Munz Decl. ¶ 25 & Ex. I; Law Dep. at 19.) The monitoring team reported this call to ER for further investigation into possible violations of the Federal Regulation B of the Fair Credit and Reporting Act. (Law Dep. at 19.)

ER investigated Plaintiff's call and determined that his comments could have had the

---

[12]ECF No. 45 Ex. G.

[13]ECF No. 45 Ex. H.

effect of discouraging the borrower from taking the loan and recommended that he be given a written warning. (Law Dep. at 19-20.) As a result, Plaintiff received a written warning on May 21, 2007. (Munz Decl. ¶ 25 & Ex. I.)

In September 2007, Munz accepted a new assignment with another team, and Brook Harwood became Plaintiff's new manager. (Bluemling Dep. at 66, 74; Munz Decl. ¶ 26.) Munz states that, during the entire time Plaintiff reported to him, Plaintiff was a consistently good producer. (Munz Dep. at 9-10; Munz Decl. ¶¶ 13, 22, 26 & Exs. C, G (Commitment and Alignment Conversations dated January 23, 2007 and April 24, 2007.)

Munz states that he never saw any deterioration in Plaintiff's performance from February 2007 when Plaintiff first informed Munz of his headaches to September 2007 when his supervision of Plaintiff transitioned to Harwood. (Munz Dep. at 9-10.) However, he also stated that, during the last several months of Plaintiff's employment with PNC, "he began to fall off drastically." (Munz Dep. at 15.)

The Promotion Issue

On October 5, 2007, Plaintiff called ER and complained that his supervisors failed to promote him even though he was a top producer. (Bluemling Dep. at 138-39; Law Decl. Ex. H.) During that call, Plaintiff stated that he was 10% disabled because of headaches and an American Veteran. He emphasized that his initial supervisor (Munz) had promised him a promotion after he completed a year of service and his subsequent supervisor (Harwood) had failed to carry through on that promise. (Bluemling Dep. at 138-39; Law Decl. Ex. H.)

ER contacted Harwood about Plaintiff's complaint, and Munz, Harwood, their supervisor Russell Westerberg and Plaintiff met to discuss the promotion issue. (Bluemling Dep. at 74-75,

138-39; Law Decl. Ex. H.)  In early October 2007, Munz, Harwood and Westerberg held a meeting in a conference room near the sales floor, the conference rooms that Lead FSCs regularly used for conferences and meetings with FSCs.  (Munz Decl. ¶ 27.)  Plaintiff states that the meeting was held where others could see and that Munz, Harwood and Westerberg spoke to him harshly.  (Bluemling Dep. at 243-45, 248.)  According to Munz, at the meeting, he, Harwood and Westerberg told Plaintiff that they had decided not to promote him because of his policy violations, inappropriate conduct and corrective actions; a promotion required more than just good production, it also required leadership skills and adherence to PNC policies.  (Munz Dep. at 13-15; Munz Decl. ¶ 27.)

Munz states that the criteria for promotion under NFSC promotion guidelines and the promotion guidelines for the FSC positions require exemplary business results, strong leadership ability, the demonstration of PNC values such as performance, customer focus, respect, integrity, diversity and team work, and, further, the promotion guidelines make clear that to be promoted an employee must not be subjected to corrective actions.  (Munz Decl. ¶ 28 & Exs. J, K.)

Defendant points out that, at the time of the October meeting, Plaintiff had a total of nine warnings – six verbal and three written.  <u>See</u> Munz Decl. ¶¶ 10, 12, 17, 19-21, 23-25.  Plaintiff was not aware of the NFSC and FSC promotion guidelines when he complained to ER or when he had the meeting with Munz, Harwood and Westerberg to discuss the promotion issue or at any time during his employment.  (Bluemling Dep. at 264, 269.)

On October 12, 2007, Plaintiff again called ER complaining that Harwood had told him on October 10 that he was not eligible for the Circle of Excellence and the Chairman's Circle awards (the "Programs") because he had written warnings.  (Bluemling Dep. at 139-40; Law

Decl. ¶ 15 & Ex. I.)  Plaintiff stated that he checked with Russ Westerberg (Harwood's superior), who told him that he was still eligible to participate in these Programs.  (Bluemling Dep. at 140-41.)  Plaintiff felt that Harwood's refusal to allow him to participate in the Programs was in retaliation for his having complained about not being promoted.  (Bluemling Dep. at 140-41.)

The Second Call Dumping Incident

On October 10, 2007, Lead FSC Mario Gliozzi reported to ER that while he and another Lead FSC were live monitoring FSC calls, Plaintiff transferred an irate customer back into the call queue and, when that customer's call bounced back to him because he was the next available consultant in the queue, he hung up on the customer, thereby engaging in two instances of call dumping.  (Law Dep. at 14-17, 28; Law Decl. ¶ 4.)

Janice Law conducted an investigation and determined that Plaintiff had indeed dumped calls in violation of PNC policy.  (Law Decl. ¶ 5.)  When she asked Plaintiff about it, he initially told her he did not remember the calls at all due to a disability but then seemed to remember certain parts of the calls.  (Law Dep. at 14-17; Bluemling Dep. at 182-83.)  Plaintiff states that Law told him that, because of these inconsistencies, she immediately concluded that he was lying (as did Mario Gliozzi) and therefore placed him on paid leave on October 18, 2007 pending further investigation.  (Bluemling Dep. at 133-35, 182-83, 245.)  Law subsequently told him that she "could not prove that he was lying" and she allowed him to return to work on October 25, 2007.  (Bluemling Dep. at 133-35, 182-83.)  However, she gave him a final written warning for engaging in call dumping.  (Bluemling Dep. at 135; Law Dep. at 14-17; Law Decl. ¶ 6 & Ex. A.)  Further, Law gave Plaintiff a verbal warning for disclosing to co-workers

confidential information concerning this investigation. (Law Dep. at 14-17.)

Plaintiff testified that he was only allowed to return to work because he had retained an attorney. He further testified that he returned to a hostile environment; specifically that his name tag was removed from his cubicle. (Bluemling Dep. at 141-42.)

The HCP Questionnaire

Law states that Plaintiff's professed inability to remember the details immediately after the call ended raised concerns about his ability to perform the functions of his sales position. (Law Dep. at 29-30.) She told Plaintiff to have his doctor complete a Health Care Provider Questionnaire (the "HCP Questionnaire") to document his medical condition and its effect, if any, on his short-term memory and his ability to perform the functions of his job. (Bluemling Dep. at 254; Docket No. 50 at 4-5.) Law states that, as a matter of course, PNC requested medical documentation in the form of the HCP Questionnaire whenever, inter alia, there was any question regarding an employee's ability to perform the essential functions of his/her position or if an employee required an accommodation. (Law Decl. ¶ 7.)

Plaintiff testified that the HCP Questionnaire which he was forced to complete by a certain date in order to return to work after Janice Law put him on leave because she thought (but then could not prove) that he was lying about having difficulties remembering certain events was a form of retaliation. Plaintiff states that he was told he could only come back to work if he had the HCP Questionnaire completed. Plaintiff testified that he was pressured to have the HCP Questionnaire completed quickly and told that PNC did not know if he could do his job with his disability. (Bluemling Dep. at 254-56, 272.)

In late November 2007, Plaintiff submitted the completed HCP Questionnaire, which

reflected that he had PCS with symptoms of frequent headaches, difficulty concentrating, sensitivity to bright lights and "some points may suffer memory loss." (Bluemling Dep. at 227, 253-56; ECF No. 50 at 4-5.) In response to questions regarding whether the condition was under control, what limitations Plaintiff's condition had on his ability to perform the functions of his position and what accommodations might be appropriate, his doctor wrote that "further work-up" was required to answer these questions. (Docket No. 50 at 4-5.) Plaintiff testified that his doctor was not comfortable with the broad questions on the form, but he pressed his doctor to provide at least some information or "they're probably going to fire me." (Bluemling Dep. at 253-56.)

On or about November 6, 2007, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") asserting that PNC discriminated against him, harassed him and retaliated against him because of his disability. (Bluemling Dep. Ex. 17.) Law states that, upon receipt of the Charge of Discrimination, she immediately initiated an investigation concerning the allegations in the Charge, but was unable to speak with Plaintiff, who stated that he was working with an attorney and didn't think he was allowed to talk to her. (Law Dep. at 31-32.)

Plaintiff's Employment with PNC Ends

On November 30, 2007, Plaintiff submitted a written letter of resignation, in which he stated as follows:

> I am resigning from my position with PNC Financial Services Group Inc. because of the ongoing harassment and discrimination due to my disability, perceived disability, as a disabled American Veteran and retaliation for complaining about the same. This is a constructive discharge.

(Bluemling Dep. Ex. 14; see Bluemling Dep. at 141-42.) When asked if anyone told him he was going to be fired before he resigned, he said that no one would answer him when he asked that

question and that he was told "we don't know what we're going to do." (Bluemling Dep. at 146.) See also ECF No. 45 Ex. D, Pl.'s Dep. Ex. 17 at 3 (in his EEOC Charge, Plaintiff declared under penalty of perjury that Janice Law "told me that they did not know if I could do my job with my disability and they would have to look in to it and get back to me.")

Procedural History

As noted above, on November 6, 2007, Plaintiff filed a charge of discrimination with the EEOC, requesting that it be cross-filed with the Pennsylvania Human Relations Commission (PHRC). He indicates that he received a Notice of Right to Sue letter dated July 11, 2008. (Compl. ¶ 11.) Plaintiff filed this action on October 7, 2008. Count I alleges that Defendant violated the ADA when it discriminated against him on the basis of his disability and/or perceived disability, that it subjected him to a hostile work environment, that it failed to promote him, denied him the right to win two incentive trips because of the retaliatory warnings he had received, used the days he was absent because of his disability against him, failed to accommodate him by reducing the amount of service calls as he requested, and retaliated against him for complaining about acts of discrimination PNC's and failure to accommodate by limiting the number of account calls he received and subjecting him to additional service calls. Count II reiterates these claims under the PHRA.[14]

On January 19, 2010, Defendant filed a motion for summary judgment.

Summary Judgment

_____

[14]Defendant observes that the Complaint also states that Plaintiff was "discriminated against because of his sex," Compl. ¶ 1. Defendant states that, during Plaintiff's deposition, his counsel stipulated for the record that there is no claim for sex discrimination and that this reference was a "typo error." Plaintiff has not challenged this assertion and does not appear to advance a claim of sex discrimination in this case.

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Disability Discrimination Claims

Plaintiff alleges that he was discriminated against on the basis of his disability, which he identifies as PCS that causes him severe headaches and affects his memory, conditions that he contends were exacerbated by having to deal with a lot of service calls. He asserts that he was subjected to adverse employment actions in the form of corrective actions on the basis of his disability.

Defendant does not dispute that Plaintiff suffers from the physical problem of having PCS, but it contends that: 1) he has not established that the problem rendered him "disabled"; 2)

he was not substantially limited in any major life activity at the time he resigned; 3) he was not otherwise qualified to perform an essential function of his job because his proposed accommodation (not having him answer service calls) would remove an essential component of the FSC position; 4) he did not suffer an adverse employment action because of his PCS; and 5) even if he could establish a prima facie case, it has pointed to legitimate, nondiscriminatory reasons for the conduct he challenges and he has not proffered evidence from which a trier of fact could conclude that these reasons are a pretext for unlawful disability discrimination.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination on the basis of disability is also prohibited by the PHRA. 43 P.S. § 955(a).

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). This model, originally applied in Title VII cases, also applies to claims under the ADA. See Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998). Employment discrimination claims under the PHRA also follow the McDonnell-Douglas format. See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002).

If the employee presents a prima facie case of discrimination, the employer must

"articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

McDonnell Douglas, 411 U.S. at 802.  If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination.  Id. at 804.  The Court of Appeals for the Third Circuit has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered  legitimate  reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action  (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

### Prima Facie Case of Disability Discrimination

The Court of Appeals has stated that:

> To establish a prima facie case of discrimination under the ADA, a plaintiff must ... show "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."

Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004) (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)).  "Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities."  Id.

### Whether Plaintiff Has a Disability

The ADA in effect at the time this case was filed defined the term "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of having such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (1990); 29 C.F.R. § 1630.2(g). Regulations issued by the EEOC state that the phrase "major life activities" includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(*i*).[15] The Court of Appeals has also recognized concentrating, remembering, cognitive function and thinking as major life activities. See Emory v. Astrazeneca Pharms., L.P., 401 F.3d 174, 183 (3d Cir. 2005); Gagliardo v. Connaught Labs., Inc., 311 F.3d 565, 569 (3d Cir. 2002); Taylor v. Phoenixville Sch. Dist., 184 F.3d 296 at 307.

The term "substantially limits" means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The regulation further provides that:

(2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

---

[15]The ADA was amended effective January 1, 2009. However, all of the courts of appeals that have resolved the issue have found that the amendments do not apply retroactively to conduct that occurred before the effective date. See Carreras v. Sajo, Garcia & Partners, 596 F.3d 25, 33 n.7 (1st Cir. 2010); Becerril v. Pima County Assessor's Office, 587 F.3d 1162, 1164 (9th Cir. 2009); Fredricksen v. United Parcel Serv., 581 F.3d 516, 521 n.1 (7th Cir. 2009); Lytes v. DC Water & Sewer Auth., 572 F.3d 936, 939-42 (D.C. Cir. 2009); Milholland v. Sumner County Bd. of Educ., 569 F.3d 562, 565-67 (6th Cir. 2009); EEOC v. Agro Distribution, LLC, 555 F.3d 462, 469 n.8 (5th Cir. 2009). Plaintiff does not argue that the amendments apply retroactively to the conduct in this case, which occurred in 2006 and 2007, and the Court will not presume that they do.

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

(3) With respect to the major life activity of working--

(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

(ii) In addition to the factors listed in paragraph (j)(2) of this section, the following factors may be considered in determining whether an individual is substantially limited in the major life activity of "working":

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(2, 3). The Supreme Court has held that:

It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection ... to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience ... is substantial."

Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002) (quoting Albertson's, Inc. v.

Kirkinburg, 527 U.S. 555, 567 (1999)).

Defendant contends that Plaintiff has not established that he is disabled or substantially limited in any major life activity because he merely states that his PCS causes him to have headaches which were exacerbated by the stress of service calls while he worked at PNC. Defendant argues that Plaintiff cannot establish that he was substantially limited in the major life activity of working because he excelled at his own job and cannot point to a broad range of job that he could not perform, and that he cannot establish that he was substantially limited in the major life activity of cognitive function because he has a high level of cognitive functioning with only certain narrow and minor limitations (two instances of memory loss).[16] It also argues that he cannot contend that he was "regarded as" disabled because he maintains that he actually suffered from a disability.

However, with respect to the final point, the Court of Appeals has held that "a plaintiff may plead in the alternative, and our caselaw finds no difficulty with pairing the two claims in one complaint." Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 189 (3d Cir. 1999). The court further noted that claims of actual and "regarded as" disability are not even intrinsically contradictory, as a plaintiff may have an impairment (whether or not it rose to the level of a disability) that could actually be accommodated, despite the employer's perception that the disability was too severe to accommodate.

In this case, Plaintiff has not established that he was actually disabled or regarded as

---

[16]In arguing that Plaintiff only identified two instances of memory loss (forgetting to quote the interest rate as APR and forgetting some details of the October 2007 call-dumping incident), Defendant has omitted the fact that Plaintiff testified that he suffered instances of memory loss "all the time" and that "[o]ver the course of time, it got worse." (Bluemling Dep. at 183.)

disabled with respect to the major life activity of working, but genuine issues of material fact exist as to whether PNC regarded Plaintiff as disabled with respect to the major life activity of cognitive function. First, as cited above, when Munz discovered that Plaintiff was call dumping in February 2007, he approached Plaintiff, who explained that he had a disability. Munz initially intended to give Plaintiff a final written warning, per PNC policy for this infraction. However, he contacted Rich Brizzi at ER, who indicated that Plaintiff needed to show documentation supporting his disability. According to PNC's own records, Plaintiff then did so:

> Michael Bluemling did show documentation supporting his disability. Rich Brizzi stated that it was sufficient that Michael did show me the documentation and keeping a copy on file or sending it to him was unnecessary. According to Rich Brizzi, since he did show documentation for this disability we could proceed to a final written warning, but we could also consider it a counseling session. I chose to make it a counseling session since a disability did exist.

(Docket No. 50, Pl.'s Exs. at 17.)[17]  See also ECF No. 50 at 13 (Rich Brizzi noted that "[m]edical documentation was presented."); Bluemling Dep. at 190 (when Munz asked him to provide documentation, he "brought all the paperwork in.")  Nor can this sequence of events be described as some sort of informal or internal process. PNC's own ADA Policy Guidance states that managers should not approve or deny the merits of employees' accommodation requests, but should instead contact ER, at which point:

> The Employee Relations Specialist will begin the interactive process with the employee and determine if the employee is a qualified individual with a disability as defined by the ADA.  You will be updated by the Employee Relations Specialist throughout this process.

---

[17]It is noteworthy that PNC's records indicate that it was unnecessary to retain documentation regarding Plaintiff's disability, yet it now contends that there are no medical records to support his claim. See ECF No. 53 ¶ 5 (observing that "the only medical documentation in the record" is the HCP Questionnaire).

(Docket No. 50, Pl.'s Exs. at 7) (emphasis added).  Thus, a jury could reasonably conclude that, pursuant to PNC's own policies, Rich Brizzi of ER evaluated the documentation Plaintiff presented in March 2007 and determined that he was disabled for purposes of the ADA.  See Harvey v. Wal-Mart La., L.L.C., 665 F. Supp. 2d 655, 669 (W.D. La. 2009) (when employer received documentary proof of employee's medical condition and how it affected him and granted an accommodation, there was a genuine issue of material fact as to whether it regarded him as disabled).  Then an interactive process was begun, which resulted in PNC proposing an accommodation of Plaintiff taking additional breaks to help him when he suffered headaches that were exacerbated by the service calls.[18]

Subsequently, when Plaintiff again experienced difficulties dealing with service calls, the record, with all inferences drawn in Plaintiff's favor as the non-moving party, shows that PNC suspended him to investigate whether he was lying when he stated that his disability affected his ability to remember certain details of service calls he had dumped, then reinstated him after it was unable to prove he was lying and directed him to have his doctor complete the HCP Questionnaire as a condition of him coming back to work.  Plaintiff did return the HCP Questionnaire, on which his doctor wrote that he had PCS but that answering further questions as to how it limited his ability to perform his job and what accommodations he might need required "further work-up."  Plaintiff has indicated that when he returned his name tag had been removed from his cubicle and he was told that PNC did not know what it was going to do to him.

---

[18]Whether this was a reasonable accommodation is discussed below.

These events could be understood by the trier of fact as indicative that PNC regarded Plaintiff as disabled and was discriminating against him because of his disability.  See Tice v. Centre Area Transp. Auth., 247 F.3d 506, 515-16 (3d Cir. 2001) (request for a medical exam may be taken in conjunction with other evidence or circumstances surrounding the request to establish that the employer regarded the employee as disabled).[19]  Plaintiff has testified that he was pressured to have the HCP Questionnaire completed quickly and told that PNC did not know if he could do his job with his disability. (Bluemling Dep. at 254-56, 272; ECF No. 45 Ex. D, Pl.'s Dep. Ex. 17 at 3.)  Given this sequence of events, there is a genuine issue of material fact as to whether PNC regarded Plaintiff as disabled.

Whether Plaintiff Was Otherwise Qualified

Defendant argues that Plaintiff was not "otherwise qualified" for the position of FSC because his proposed accommodation (not taking any service calls) would remove an essential function of the position.  The Court of Appeals has held that:

> A "qualified individual" is defined as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); Buskirk [v. Apollo Metals], 307 F.3d 160,] 168 [(3d Cir. 2002)]. The EEOC regulations divide this inquiry into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position. 29 C.F.R. § 1630.2(n); Buskirk, 307 F.3d at 168.

Turner v. Hershey Chocolate U.S.A., 440 F.3d 604, 611 (3d Cir. 2006).  The court further

---

[19]The ADA also has a specific provision placing limits on an employer's mandate that an employee undergo a medical exam.  42 U.S.C. § 12112(d)(4).  See Tice, 247 F.3d at 516-18. However, Plaintiff has not invoked this section and has not claimed that he was subjected to an improper medical exam.

observed that:

>Whether a job duty is an "essential function" turns on whether it is "fundamental" to the employment position. 29 C.F.R. § 1630.2(n)(1). The term "essential function" does not include the "marginal" functions of the position. Id. A job function may be considered essential for any of several reasons, including, but not limited to, the following:

>(i) The function may be essential because the reason the position exists is to perform that function;

>(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

>(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

Id. at 612 (quoting 29 C.F.R. § 1630.2(n)(2)).  The regulation further provides that:

>Evidence of whether a particular function is essential might include, but is not limited to:

>(i) The employer's judgment as to which functions are essential;

>(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

>(iii) The amount of time spent on the job performing the function;

>(iv) The consequences of not requiring the incumbent to perform the function;

>(v) The terms of a collective bargaining agreement;

>(vi) The work experience of past incumbents in the job; and/or

>(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

In Turner, the court reversed the district court's entry of summary judgment for the employer and rejected its conclusion that the employer's "rotation scheme" was an essential

function of the plaintiff's shaker table inspector position because the written job description contained no reference to rotating, little time was actually spent rotating from machine to machine, the collective bargaining agreement made no reference to rotating and shaker table inspectors did not historically rotate. 440 F.3d at 612-13. The court noted that the employer's judgment as to which functions are essential "is but one piece of evidence to be considered by the trier of fact." Id. at 613 n.6.

In this case, Andrew Munz states that taking service calls is an essential function of the FSC position. (Munz Decl. ¶¶ 8, 17.) However, other than submitting the declaration of Andrew Munz, PNC has not addressed the factors outlined in the regulation. For example, it has not submitted the job description for the FSC position. As noted above, at his deposition, Plaintiff testified that he had never before seen the job description PNC's counsel showed him, titled "Financial Sales/Service Consultant," and that he did not understand why he was receiving service calls when that was not the job he was hired to do. (Bluemling Dep. at 46-51, 193, 212.) Nor has Defendant discussed any of the other factors cited in the regulation.

In addition, the record contains genuine issues of material fact as to whether taking service calls was an essential function of Plaintiff's position. First, as cited above, Randy Yocca explained that there are "Sales FSCs" and "Service FSCs," that Sales FSCs are assigned "back-up" service skills and handle service calls if there are no sales calls waiting to be answered and if more than one Sales FSC has been sitting idle, and that modifications to an FSC's responsibilities, including removing service calls from an FSC's responsibilities, may be made by the Service Level Team (Yocca Decl. ¶¶ 6-9). Further, Brook Harwood acknowledged that

the service calls "could have been turned off." (Harwood Dep. at 35.)[20] Defendant has not addressed this testimony.

Genuine issues of material fact preclude the entry of summary judgment on the issue of whether taking service calls is an essential function of Plaintiff's position. Therefore, Defendant's argument for summary judgment on this basis should be rejected.

<u>Whether Plaintiff Suffered an Adverse Employment Action</u>

Defendant argues that Plaintiff did not suffer an adverse employment action because he was merely subjected to oral and written reprimands by way of corrective actions. However, the very case it cites to support this proposition demonstrates that its argument is too sweeping:

> Weston failed to establish how these two reprimands effect a material change in the terms or conditions of his employment. We cannot, therefore, characterize them as adverse employment actions. Weston's own deposition testimony indicates that he was not demoted in title, did not have his work schedule changed, was not reassigned to a different position or location in the prison, did not have his hours or work changed or altered in any way, and that <u>he was not denied any pay raise or promotion as a result of these reprimands</u>. Additionally, <u>the reprimands were of a temporary nature. Because they were not permanently affixed to Weston's employment file, we cannot see how they changed or altered his employment status in any way</u>. Moreover, Weston suffered no reduction in pay, reassignment, firing, or any similar employment action.

<u>Weston v. Pennsylvania</u>, 251 F.3d 420, 431 (3d Cir. 2001) (emphasis added).

By contrast, the verbal and written warnings Plaintiff received were affixed to his employment file and the "final written warning" he received after the second call dumping incident strongly suggests that it was about to have a significant effect on his employment status. Moreover, Defendant has stated that Plaintiff was not promoted because he had corrective actions in his record, and many of them were related to his impairment. Thus, the corrective

---

[20]ECF No. 50 Pl.'s Exs. at 87.

actions did have an effect upon his employment status.

In addition, as noted above, failing to make reasonable accommodations (an issue that cannot be resolved on this record, as discussed below) also constitutes an adverse employment action under the ADA.  Taylor v. Phoenixville Sch. Dist., 184 F.3d at 306.  This argument is unavailing.

Defendant's Proffered Reason and Plaintiff's Evidence of Pretext

Defendant argues that, even assuming that Plaintiff could establish a prima facie case of disability discrimination, it has proffered legitimate, nondiscriminatory reasons for the actions it took and he has not pointed to evidence from which the trier of fact could conclude that its reasons are a pretext for unlawful disability discrimination.  Specifically, it contends that he received verbal and written corrective actions for dumping service calls and for excessive absences because he actually committed these infractions of PNC policy.  Defendant has met its burden of proffering a legitimate, non-discriminatory reason for its actions.

However, the record contains evidence from which the trier of fact could conclude that these reasons are a pretext for unlawful disability discrimination.  Specifically, although PNC became aware no later than February 2007 of Plaintiff's disability and the difficulties he faced (severe headaches that were exacerbated by stressful service calls), it required him to continue taking service calls and then, when further problems arose, it responded by giving him more corrective actions.

After the first call-dumping incident, although PNC's records indicate that it recognized he had a disability, PNC nevertheless gave him a verbal warning.  Moreover, Munz's final comment in his notes was that "[s]ince Michael informed me that he could do the essential

functions of the job and can make those reasonable accommodations, if this violation were to occur in the future, it will lead to a final written warning." (Docket No. 50 at 17.) In other words, Munz appears to be announcing that, if Plaintiff ever again dumped calls because of his professed inability to handle the stress of a service call, such action would be treated as a serious infraction and subjected to punishment.

More significantly, this is exactly what occurred. When Plaintiff was again cited for call dumping in October 2007 and then stated that he could not remember all of the details of what occurred during the call because of his disability, Janice Law immediately suspected that he was lying and put him on leave pending further investigation. According to Plaintiff, Law subsequently told him that she "could not prove he was lying," so she allowed him to return to work, but nevertheless gave him a final written warning. Brook Harwood, Plaintiff's direct supervisor, testified that he was out of the office when this incident occurred and that when he returned he did not think it would be "appropriate" for him to discuss Plaintiff's situation with him because he "was under investigation" at the time. (Harwood Dep. at 20-22.)[21]

Law then handed Plaintiff the HCP Questionnaire and instructed him to have his doctor complete it as part of allowing him to return to work. Plaintiff has testified that he was told that completing this questionnaire was a requirement of his return to work and that he was pressured to do so quickly. (Bluemling Dep. at 254-56, 272.) He testified that his doctor was not comfortable with the broad questions on the form, but he pressed his doctor to provide at least some information or "they're probably going to fire me." (Bluemling Dep. at 253-56.) Moreover, his direct supervisor testified that he was unaware that Plaintiff was being required to

---

[21]ECF No. 50, Pl.'s Exs. at 96-98.

complete the HCP Questionnaire or the results of this exam. (Harwood Dep. at 27.)[22]

In addition, at least two of the corrective actions concerned Plaintiff's excessive absences. Defendant contends that Plaintiff never told anyone that his absences were connected to his disability, but all inferences must be drawn in Plaintiff's favor as the non-moving party. DeHart v. Horn, 227 F.3d 47, 50 (3d Cir. 2000) (en banc). Munz admitted that Plaintiff told him that he was having headaches and that he could not take service calls. Munz states that Plaintiff "never indicated that it was an ongoing medical condition" and that "a headache can be anything." (Munz Dep. at 22-23.) Although these statements might be true in the abstract, they must be examined in the context of the entire history of events.

According to the record, as of late February/early March 2007, Munz was aware of the following: Plaintiff had a medical condition which caused him severe headaches; PNC had stated that he provided documentation that his impairment constituted a disability; Plaintiff stated that these headaches were exacerbated by the service calls and he dumped some of these calls; PNC offered the accommodation of having Plaintiff take additional breaks (although he had requested to be relieved of taking service calls altogether). Thus, when Plaintiff requested time off because of "headaches" in April and May 2007, Munz had the background to consider whether the headaches and time off might be related to Plaintiff's disability and the fact that he was still being required to take service calls. Instead, Munz cited Plaintiff for excessive absence time despite his knowledge of these background events.

The record contains such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

_____

[22]ECF No. 50, Pl.'s Exs. at 99.

factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons." <u>Fuentes</u> 32 F.3d at 765. Therefore, with respect to Plaintiff's disability discrimination claims, the motion for summary judgment should be denied.

<u>Failure to Accommodate Claims</u>

Plaintiff alleges that Defendant failed to provide accommodations he requested so that he could perform the essential functions of his job, namely to reduce the number of service calls that exacerbated his headaches and to allow him to leave early when he did not feel well. Defendant argues that: 1) Plaintiff has not established that he had a "disability"; and 2) each time he requested an accommodation it was provided to him, he did not indicate that the accommodation provided with respect to service calls (rest breaks) was insufficient, and his proposed accommodations (removing all service calls from his queue or transferring him to an unspecified position) are not reasonable.

Under the ADA, the term "reasonable accommodation" may include

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B). ADA regulations provide that:

> (1) The term reasonable accommodation means:

> (i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed,

32

that enable a qualified individual with a disability to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

(2) Reasonable accommodation may include but is not limited to:

(i) Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(ii) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

(3) To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(*o*).

As indicated above, genuine issues of material fact preclude the entry of summary judgment in Defendant's favor with respect to the argument that Plaintiff did not have a disability, at least with respect to the theory that PNC regarded him as disabled in the major life activity of cognitive function. Furthermore, the trier of fact will have to resolve whether PNC's accommodations were reasonable. See Williams, 380 F.3d at 771 ("The question of whether a proposed accommodation is reasonable is a question of fact.")

The Court of Appeals has held that:

an employee who tries to hold his/her employer responsible for a breakdown in the interactive process under the ADA must show:

1) the employer knew about the employee's disability; 2) the employee requested

accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

Conneen v. MBNA America Bank, N.A., 334 F.3d 318, 330-31 (3d Cir. 2003) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d at 319-20).

As cited above, the first incident of call dumping resulted in PNC offering the accommodation of Plaintiff taking additional breaks to help him when he suffered headaches that were exacerbated by the service calls. Defendant also argues that after this incident he stated that he would continue to handle service calls and that he did not complain about the issue anymore. Yet Munz acknowledged that Plaintiff did complain thereafter about having headaches and that he asked to be relieved of taking service calls. (Munz Dep. at 22-23.)

As summarized above, although PNC proposed an accommodation for Plaintiff's disability, it nevertheless gave him a verbal warning and Munz's final comment did not leave open the possibility that Plaintiff and PNC might need to engage in the interactive process again in the future (because the proposed accommodation had not been successful), but instead announced that, if Plaintiff ever again dumped calls because of his professed inability to handle the stress of a service call, such action would be treated as a serious infraction and subjected to punishment. Then, when Plaintiff was again observed dumping a call in October 2007 and he stated that he could not remember all of the details of what occurred during the call because of his disability, Janice Law immediately suspected that he was lying and put him on leave pending further investigation. No interactive process occurred; indeed, no one appears to have referenced or recalled the prior incident or the history of the situation.

Law subsequently told Plaintiff that she "could not prove he was lying," so she allowed

him to return to work, but nevertheless gave him a final written warning and required him to complete the HCP Questionnaire as part of allowing him to return to work. Although Defendant portrays this incident as part of the interactive process, it could also be viewed by the trier of fact as a punitive response to Plaintiff's situation. Plaintiff has testified that he was told that completing this questionnaire was a requirement of his return to work and that he was pressured to do so quickly. (Bluemling Dep. at 254-56, 272.) He testified that his doctor was not comfortable with the broad questions on the form, but he pressed his doctor to provide at least some information or "they're probably going to fire me." (Bluemling Dep. at 253-56.) Moreover, his direct supervisor testified that he was unaware that Plaintiff was being required to complete the HCP Questionnaire or the results of this exam. (Harwood Dep. at 27.)

Defendant also contends that it could not relieve Plaintiff of the responsibility of taking service calls because this is an essential function of the FSC position. The Court of Appeals has held that "employers are not required to accommodate an employee by removing an essential function or restructuring a job so as to avoid it, but, rather, they are to provide an accommodation so as to enable the employee to perform such a function." Skerski v. Time Warner Cable Co., a div. of Time Warner Entertainment Co., L.P., 257 F.3d 273, 285 n.24 (3d Cir. 2001).

However, as noted above, there are genuine issues of material fact with respect to the question of whether taking service calls was an essential function of Plaintiff's position. Moreover, even if the record were unequivocal that taking some service calls is an essential function of the FSC position, Defendant has not explained why it could not have at least reduced the number of service calls that Plaintiff received, especially after he stated that they exacerbated

the severe headaches he suffered as a result of his disability.

Defendant also argues that Plaintiff has not pointed to positions at PNC to which he could have been transferred and therefore he cannot rely on this proposed accommodation. However, Brook Harwood testified that there were "many non-phone positions in the bank" to which Plaintiff could have been transferred. (Harwood Dep. at 52.)[23] Defendant has not addressed this testimony.

In addition, Plaintiff has testified that he requested to be allowed to leave early when he was suffering headaches because of his disability, but PNC "only let me when it was convenient for them." (Bluemling Dep. at 262.) Defendant has not discussed this aspect of Plaintiff's failure to accommodate claim. As noted above, Munz states that Plaintiff never told him that he needed to take time off because of his medical condition, yet he admitted that Plaintiff told him that he was having headaches and that he could not take service calls. Munz states that Plaintiff "never indicated that it was an ongoing medical condition" and that "a headache can be anything." (Munz Dep. at 22-23.) As summarized above, after the first call-dumping incident, Munz was aware of sufficient background information such that, when Plaintiff requested time off because of "headaches" in April and May 2007, he could consider whether the headaches and time off might be related to Plaintiff's disability and the fact that he was still taking service calls.

The Court of Appeals has held that:

"[E]ither by direct communication or other appropriate means, the employee 'must make clear that the [he/she] wants assistance for his or her disability.' " Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 332 (3d Cir. 2003) (quoting Jones v. United Parcel Serv., 214 F.3d 402, 408 (3d Cir. 2000)). "The employer must have enough information to know of 'both the disability and

---

[23]ECF No. 50, Pl.'s Exs. at 92.

> desire for an accommodation,' or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation." Id. (quoting Taylor [v. Phoenixville Sch. Dist.], 184 F.3d at 313). Indeed, "[t]he law does not require any formal mechanism or 'magic words' to notify an employer that an employee needs an accommodation and circumstances will sometimes require the employer to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." Id. at 332 (internal quotations, citations, and alterations omitted). Once proper notice has been provided, however, "both parties have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith." Id. (quoting Mengine [v. Runyon], 114 F.3d [415,] 420 (3d Cir. 1997)]).

Colwell v. Rite Aid Corp., 602 F.3d 495, 506-07 (3d Cir. 2010). In this case, although Plaintiff may not have been as forthcoming as he could have been, a reasonable jury could conclude that PNC bears much of the responsibility for the breakdown of the interactive process when it did not consider whether his requests for time off because of headaches might be related to his disability, and when it did not revisit the accommodation issue when Plaintiff again engaged in call dumping but instead accused him of lying, suspended him, and then required him to complete the HCP Questionnaire as a condition of returning to work. Therefore, with respect to the failure to accommodate claims, the motion for summary judgment should be denied.

Harassment Claims

Plaintiff alleges that he was subjected to harassment based on his disability. The Court of Appeals for the Third Circuit has assumed without deciding that a hostile environment claim exists under the ADA. Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 666-67 & n.2 (3d Cir. 1999).[24] The elements of such a claim are described as follows:

---

[24]Four courts of appeals have explicitly held that such a claim exists under the ADA. See Lanman v. Johnson City, Kan., 393 F.3d 1151, 1155 (11th Cir. 2004); Shaver v. Independent Stave Co., 350 F.3d 716 (8th Cir. 2003); Flowers v. South Regional Physician Servs., 247 F.3d 229, 235 (5th Cir. 2001); Fox v. General Motors Corp., 247 F.3d 169 (4th Cir. 2001).

> (1) [the plaintiff] is a qualified individual with a disability under the ADA; (2) []he was subject to unwelcome harassment; (3) the harassment was based on [his] disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and to create an abusive working environment; and (5) that [the employer] knew or should have known of the harassment and failed to take prompt effective remedial action

Id. at 667.  Defendant argues that: 1) Plaintiff does not have a disability; 2) the harassment was not severe or pervasive; and 3) it would be entitled to an affirmative defense based on the existence of an effective anti-harassment policy and Plaintiff's failure to take advantage of it.

As noted above, genuine issues of material fact exist was to whether Defendant regarded Plaintiff as disabled.  However, he has not pointed to severe or pervasive harassment.

The Supreme Court has stated that: "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  Defendant notes that Plaintiff identified the following comments and conduct during his deposition:

- A Capital One account manager told him he was closing loans like his cube was on fire (a negative comment) (Bluemling Dep. at 69-70, 240).

- In the context of discussing his ergonomic chair, Lead FSC Brook Harwood (his manager at the time) said "I know people with real disabilities." (Bluemling Dep. at 242.)

- Harwood told him he was not eligible for the Circle of Excellence and Chairman's Circle. (Bluemling Dep. at 243.)

- Harwood, Munz and Westerberg spoke harshly to him during the meeting about his promotion when they advised him that his inappropriate behavior, warnings and failure to exhibit leadership qualities precluded him from being promoted.  (Bluemling Dep. at 243.)

- Munz, Harwood and Westerberg held the meeting about his promotion in a conference room near the sales floor where others could see. (Bluemling Dep. at 244-45, 248.)

- Gliozzi and Law called him a liar in connection with the October 2007 call dumping investigation. (Bluemling Dep. at 245.)

- His calls were monitored more than the calls of other FSCs. (Bluemling Dep. at 247-48.)

- PNC harassed him by requiring him to complete the HCP Questionnaire. (Bluemling Dep. at 253-54.)

- His multiple corrective actions were harassment. (Bluemling Dep. at 252.)

(ECF No. 46 at 24-25.) Plaintiff has not described any other incidents in his brief.

Whether viewed individually or taken together, these comments and conduct do not rise to the level of being "severe" or "pervasive" in order to establish a hostile working environment. The Supreme Court has held that teasing, offhand comments and these kinds of isolated incidents do not rise to the level necessary to maintain such a claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Therefore, with respect to his harassment claims, Defendant's motion for summary judgment should be granted.

Constructive Discharge

The Court of Appeals has explained that:

"We employ an objective test to determine whether an employee can recover on a claim of constructive discharge .... [and must therefore] determine whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001) (internal quotations and citation omitted). Factors we have found relevant to this issue are whether the employer (1) "threatened [the employee] with discharge" or "urge[d] or suggest[ed] that she resign or retire," (2) "demote[d] her," (3) "reduce[d] her pay or benefits," (4) "involuntarily transferred [her] to a less desirable position," (5) altered her "job responsibilities," or (6) gave "unsatisfactory job evaluations."

Colwell v. Rite Aid Corp., 602 F.3d at 502-03 (quoting Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)).

Defendant contends that Plaintiff not pointed to any of these factors in this case. However, Plaintiff has testified that, when he inquired why he was being required to complete the HCP Questionnaire and whether he was about to be fired, no one would answer him but instead he was told "we don't know what we're going to do." (Bluemling Dep. at 146.) This might be sufficient to meet either the "threaten with discharge" or "urge the employee to retire" scenarios.

In addition, the Court of Appeals has held that "we have never made the Clowes factors an absolute requirement for recovery." Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 168 (3d Cir. 2001). Plaintiff has also testified that he returned to find his name tag removed from his cubicle, a final written warning and a directive that he complete the HCP Questionnaire as a condition of continuing his employment, and he saw that PNC was not accommodating his disability but instead responded with corrective actions. Under these circumstances, the trier of fact might conclude that he left because he saw "the handwriting on the wall," see EEOC v. University of Chicago Hosp., 276 F.3d 326, 332 (7th Cir. 2002), and/or that PNC's complete failure to accommodate his disability constituted a constructive discharge, see Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1109 (6th Cir. 2008).

Genuine issues of material fact exist which preclude the entry of summary judgment in Defendant's favor on Plaintiff's constructive discharge claims. Therefore, with respect to them, the motion for summary judgment should be denied.

Failure to Promote Claims

Plaintiff alleges that Defendant failed to promote him to a Senior FCS position because of his disability. Defendant argues that: 1) he has not established that he was disabled; 2) he was not qualified for the position because of his numerous corrective actions; and 3) he has not pointed to other, non-disabled individuals who received more favorable treatment.

As explained above, a genuine issue of material fact exists with respect to the issue of whether PNC regarded Plaintiff as disabled. However, Defendant has proffered evidence that Plaintiff was not "qualified" for the Senior FSC position because of his numerous corrective actions. PNC's promotion guidelines specifically indicate that an employee must not have corrective actions on his record. (Munz Decl. ¶ 28 & Exs. J, K.) Even setting aside the corrective actions arising out of the call-dumping incidents, the one in which he failed to follow the PNC script regarding quoting an interest rate and the ones for excessive absences, he still had at least four corrective actions that are not related to his disability in any way: he extended a bank card to a customer within three days of a change of address, used profanity in the workplace, suggested that a customer obtain a co-signer which might have violated Regulation B of the FCRA and failed to follow the protocol of Capital One. In addition, he has not pointed to other, similarly situated non-disabled individuals who received more favorable treatment.

Moreover, even if he could establish a prima facie case, Defendant has pointed to a legitimate, non-discriminatory reason for not promoting him (the corrective actions) and he has not proffered evidence that this reason is a pretext for unlawful disability discrimination. Therefore, with respect to these claims, Defendant's motion for summary judgment should be granted.

Retaliation Claims

Plaintiff alleges that Defendant retaliated against him for complaining about disability discrimination. Defendant argues that: 1) Plaintiff proffers no evidence to support his contention that he received more service calls and this would not constitute an adverse employment action in any event; 2) he cannot establish a causal link between his protected activity and the alleged adverse employment actions; and 3) even if he could state a prima facie case, it has pointed to a legitimate, nondiscriminatory reason and he has not proffered evidence from which the trier of fact could conclude that it is a pretext for unlawful discrimination.

Discrimination against an individual who has opposed a practice prohibited by the ADA or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under the statute is itself actionable conduct. 42 U.S.C. § 12203(a). The same is true under the PHRA. 43 P.S. § 955(d).

The Court of Appeals has held that the prima facie case elements for a claim of retaliatory discrimination are as follows: 1) the plaintiff engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action. Moore v. City of Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006). The plaintiff does not have to show that he is a qualified individual with a disability to bring a retaliation claim. Hohider v. United Parcel Serv., 574 F.3d 169, 191 n.19 (3d Cir. 2009).

Defendant does not dispute that Plaintiff opposed what he perceived to be disability discrimination, but it contends that the only action to which he points – receiving more service

calls – is unsubstantiated and does not constitute an "adverse employment action" in any event. Plaintiff has not proffered evidence that he received more service calls. Therefore, he cannot maintain a retaliation claim on this basis.

Plaintiff also contends that he was retaliated against by receiving fewer sales calls[25] and that certain accounts he previously handled were being routed to other FSCs; that after he complained about not receiving a promotion, Harwood retaliated against him by issuing an email stating that he would not be eligible to participate in the Circle of Excellence or Chairman's Award Programs; and that the HCP Questionnaire which he was forced to complete by a certain date in order to return to work after Janice Law put him on leave was a form of retaliation. (Bluemling Dep. at 254-56, 271.)

These incidents are insufficient to constitute "actions that a reasonable employee would have found to be materially adverse in that they might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."

Even if Plaintiff could state a prima facie case of retaliation discrimination, Defendant has articulated legitimate, nondiscriminatory reasons for the actions it took and Plaintiff has not pointed to evidence from which the trier of fact might conclude that these proffered reasons were a pretext for unlawful retaliation discrimination. Therefore, with respect to Plaintiff's retaliation claims, the motion for summary judgment should be granted.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 44) be granted with respect to Plaintiff's harassment claims, failure to promote claims and retaliation claims and denied in all other respects.

---

25 No evidence was proffered in support of this contention.

Within the time specified in the Notice of Electronic Filing, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

LISA PUPO LENIHAN
United States Magistrate Judge

Dated: August 27, 2010